**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | S1 23 Cr. 73 (MKV) |
| **- v. -** | |
| **ROBERT WISE,** | |
| **Defendant.** | |

**SENTENCING MEMORANDUM ON BEHALF OF**
**DEFENDANT ROBERT WISE**

**LANKLER SIFFERT & WOHL LLP**
Jillian B. Berman
Angela Zhu
1185 Avenue of the Americas
New York, NY  10036
(212) 921-8399

*Attorneys for Defendant Robert Wise*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ..............................................................................1

PROCEDURAL BACKGROUND..........................................................................3

BOB WISE'S BACKGROUND............................................................................4

I.   Bob's Personal History, Education, and Professional Commitment to his Clients..................4

II.  Bob's Devotion to his Family and Critical Support to his Wife ...............................8

III. Bob Has Serious Medical Problems and Needs Constant Care. .................................13

    A.  Bob Has Suffered Significant Medical Events. ...........................................13

        ████████████████ .................................................13

        ██████████████████████████ ...............................14

        ████████████ ...............................................16

    B.  Bob's Need for Emergency Care ......................................................16

        █████████████████ ...........................................17

        ██████████████████ ..........................................17

        ████████████████████ .......................................18

        ███████████████ .............................................18

    C.  Bob Has Chronic Conditions that Require Ongoing Medical Care. ..........................19

OFFENSE CONDUCT ......................................................................21

I.   The Payments Bob Made that Constituted the Offense Conduct
Were Previously Lawful and Facially Innocuous. ...........................................21

II.  Bob Gradually Developed an Awareness of Wrongdoing. ....................................23

III. The Government Acknowledges Bob's Minor Role in the Offense. ...........................25

RELEVANT SENTENCING CONSIDERATIONS........................................................26

I.   Applicable Legal Standard...........................................................26

II.  A Variance from the Advisory Guidelines Range is Warranted, as the
Sentencing Guidelines Place Undue Emphasis on the Value of Laundered Funds. ...............28

III. Application of § 3553(a) Factors Demonstrate that a Non-Custodial Sentence
Is Just and Appropriate...................................................................................... 31

   A.  Bob's Personal History and Characteristics Warrant a Non-Incarceratory Sentence........31

      1.  Bob's Elderly Age and Serious Medical Conditions Support a
Non-Incarceratory Sentence...................................................................31

      2.  Bob's Wife Depends upon Bob as a Result of Her Significant Health Issues and
Limited Mobility.....................................................................................37

   B.  The Nature and Circumstances of Bob's Offense Support a Non-Custodial Sentence. ....40

   C.  A Sentence of Time Served Provides Sufficient Deterrence, Protects the Public, and
Serves Just Punishment...........................................................................................40

   D.  The Need to Avoid Unwarranted Sentencing Disparities Supports Time Served. ............44

CONCLUSION.........................................................................................................48

# TABLE OF AUTHORITIES

**Cases**

*Dean v. United States*,
   137 S. Ct. 1170 (2017) ........................................................................................27

*Gall v. United States*,
   552 U.S. 38 (2007) ............................................................................................39

*Koon v. United States*,
   518 U.S. 81 (1996) ............................................................................................27

*Rita v. United States*,
   551 U.S. 338 (2007) ..........................................................................................28

*Rosales-Mireles v. United States*,
   138 S. Ct. 1897 (2018) ..................................................................................26-27

*United States v. 19 Duck Pond Lane*,
   No. 23 Civ. 1545 (S.D.N.Y. Aug. 11, 2023) ....................................................26

*United States v. Algahaim*,
   842 F.3d 796 (2d Cir. 2016) ..............................................................................30

*United States v. Booker*,
   543 U.S. 220 (2005) ..........................................................................................27

*United States v. Cavera*,
   550 F.3d 180 (2d Cir. 2008) ........................................................................27–28

*United States v. Corsey*,
   723 F.3d 366 (2d Cir. 2013) ..............................................................................30

*United States v. Derkach*,
   No. 22 Cr. 432 (E.D.N.Y. Jan. 23, 2023) .....................................................46–47

*United States v. Emmenegger*,
   329 F. Supp. 2d 416 (S.D.N.Y. 2004) ...............................................................30

*United States v. Gupta*,
   904 F. Supp. 2d 349 (S.D.N.Y. 2012) ...............................................................30

*United States v. Hoats*,
   No. 19 Cr. 67 (S.D.N.Y. May 20, 2021) .......................................................36–37

*United States v. Jacoby*,
   No. 17 Cr. 676 (S.D.N.Y. Feb. 27, 2018) .....................................................32, 42

*United States v. Johnson*,
    964 F.2d 124 (2d Cir. 1992) ................................................................37

*United States v. Lumiere*,
    No. 16 Cr. 483 (S.D.N.Y. June 27, 2017) ............................................30

*United States v. Malofeyev*,
    No. 21 Cr. 676 (S.D.N.Y. Apr. 5, 2022) ..............................................46

*United States v. Moe*,
    No. 17 Cr. 277 (D.N.J. Nov. 12, 2021) ................................................36

*United States v. Osipov*,
    No. 22 Cr. 369 (D.D.C. Nov. 15, 2022) ...........................................45–46

*United States v. Preacely*,
    628 F.3d 72 (2d Cir. 2010) ..................................................................27

*United States v. Roberts*,
    No. 01 Cr. 410, 2005 WL 1153757 (S.D.N.Y. May 16, 2005) ........38-39

*United States v. Rodriguez*,
    No. 20 Cr. 513 (S.D.N.Y. Dec. 16, 2022) ............................................33

*United States v. Smalling*,
    No. 12 Cr. 61 (E.D.N.Y. Mar. 31, 2014) .........................................32-33

*United States v. Stewart*,
    No. 15 Cr. 287 (S.D.N.Y. May 18, 2016) .......................................38-39

**Statutes & Guidelines**

18 U.S.C. § 371 ..........................................................................................1, 3

18 U.S.C. § 3553(a) ............................................................................ *passim*

18 U.S.C. § 3572 ...........................................................................................44

U.S.S.G. §1B1.13 ..........................................................................................32

U.S.S.G. §2B1.1 ......................................................................................28, 29

U.S.S.G. §2S1.1 ............................................................................................28

U.S.S.G. §2X1.1 ............................................................................................28

U.S.S.G. §3B1.2 ....................................................................................25-26, 29

U.S.S.G. §3B1.3 ................................................................................................................29

U.S.S.G. §3E1.1 ................................................................................................................29

U.S.S.G. §4C1.1 ...........................................................................................................4, 29

U.S.S.G. §5C1.1 ...........................................................................................................4, 29

U.S.S.G. §5H1.1 ................................................................................................................32

U.S.S.G. §5H1.4 ................................................................................................................32

**Other Authorities**

Chris Dolmetsch, *Lawyer Laundered Russian Oligarch's Money by Paying Bills for His NY Homes*, BLOOMBERG (Apr. 25, 2023) ......................................................................43

Dylan Tokar, *American Lawyer Pleads Guilty Over Work for Sanctioned Russian Oligarch*, WALL ST. J. (Apr. 25, 2023)..............................................................43

Emily Saul, *Robert Wise Disbarred for Aiding Sanctioned Russian Oligarch*, N.Y.L.J. (Sept. 14, 2023)........................................................................................................43

Luc Cohen, *US Lawyer Pleads Guilty to Dealing with Russian Oligarch Under* Sanctions, REUTERS (Apr. 25, 2023) ............................................................................43

Defendant Robert Wise, by and through his counsel, respectfully submits this memorandum and the accompanying exhibits to assist the Court in sentencing him.

## PRELIMINARY STATEMENT

Robert ("Bob") Wise, an 83-year-old man, stands before the Court, ashamed and deeply remorseful for his conduct. He asks for forgiveness and leniency, and respectfully submits that the circumstances here warrant the non-incarceratory sentence of time served that both the U.S. Probation Office ("Probation") and the U.S. Attorney's Office (the "Government") recommend.

Bob's criminal offense was an aberration in his otherwise long and law-abiding life, and arose from an atypical set of circumstances. Bob was a practicing real estate attorney for more than 50 years who was committed to his clients and had an unblemished record. However, he made a serious error of judgment when, between 2018 and 2022, he continued to make routine property-related payments (*e.g.*, real estate taxes, common charges, etc.), which he had been making for the prior decade, on behalf of a client to maintain certain residential properties despite Bob's growing awareness of the likelihood that these properties were beneficially owned by a person who had been sanctioned by the United States on April 6, 2018. As a result of the property owner's changed status as a sanctioned individual, lawful payments like those Bob had made on behalf of these properties for over a decade became illegal. After the Government commenced its investigation, Bob recognized his misconduct, accepted responsibility, and pled guilty to a one-count Information charging conspiracy to commit international money laundering, in violation of 18 U.S.C. § 371.

A sentence that includes a term of incarceration would not be just in this case. Bob has already been punished as a result of his conduct, and is overcome with distress, shame, and fear. He suffers from many serious medical issues and conditions, ███████████████████

██████████████████████████████████████████████

████████████████████████████████████; undoubtedly, constant feelings of stress, regret,

and anxiety have taken a serious toll.  Bob and his loved ones fear that if sentenced to prison,

Bob will die behind bars.  If incarcerated, Bob will also be abandoning Kathleen, his beloved 81-

year-old wife of 49 years, who depends heavily upon Bob and has no other family nearby from

whom she can seek assistance.

There is also no benefit to society by sentencing Bob to prison.  This was a unique

offense that Bob did not set out to commit, and there is no risk that Bob will re-offend: it

happened in connection with his practice as a lawyer, and Bob has now surrendered his law

license.  Given Bob's age, he also has no need for correctional or rehabilitative training, and yet

if incarcerated, his extensive medical needs will consume critical, scarce resources better

allocated by the Bureau of Prisons to defendants for whom a non-incarceratory sentence is not a

viable option.

For these and other reasons, we respectfully ask the Court to follow Probation's

sentencing recommendation of time served, to be followed by one year of supervised release.

(Dkt. 20, Presentence Investigation Report ("PSR") at 36.)  As Probation recognizes, a custodial

sentence would not "serve the interests of justice in this case," given Bob's "advanced age,

extensive physical health issues, lack of criminal history and minor participation in the offense."

(*Id.* at 38.)  Indeed, Bob's criminal conduct "***truly represents aberrant behavior***" (*Id.* (emphasis

added)).  In an extraordinary move, the Government, too, intends to recommend a sentence of

time served.  (*See* Rider to Plea Agreement ("Plea Rider"), attached as Exhibit A, at 1.)  We urge

the Court to follow this unanimous recommendation.

## PROCEDURAL BACKGROUND

In May 2022, Bob learned of a federal investigation by the Government relating to his representation of Vladimir Voronchenko and certain entities, Medallion, Inc. ("Medallion"), and Voxi Management Corp. ("Voxi"), his long-time clients. The investigation was focused on whether the beneficial owner of Medallion and Voxi (and in turn, U.S.-based properties owned by these entities) was Viktor Vekselberg, whom the United States designated to be a Specially Designated National ("SDN") on April 6, 2018. Bob—having never had any personal interaction with the federal criminal system—retained counsel. ████████████████████████████ ██████████████████████████████████████████████ ████████████████████████████████████████████ ██████████████████ Through this investigation, Bob came to appreciate that he had consciously avoided confirming suspicions he had concerning Medallion and Voxi. Thus, certain services he had been providing since 2005, which included paying property taxes and utility bills, had run afoul of U.S. criminal laws beginning in 2018. Ultimately, when Bob understood this, he accepted responsibility.

On April 25, Bob pleaded guilty pursuant to an Information to conspiracy to commit international money laundering to promote the carrying on of violations of the International Emergency Economic Powers Act by using international wire transfers to conduct U.S. dollar transactions for the benefit of Viktor Vekselberg, an SDN, without disclosure to or approval from the Office of Foreign Assets Control ("OFAC"), in violation of 18 U.S.C.§ 371. Bob pleaded guilty pursuant to a plea agreement dated April 12, 2023 ("Plea Agreement"), which has since been supplemented by the Plea Rider, dated November 8, 2023, incorporating relevant amendments to the United States Sentencing Guidelines ("Guidelines") that took effect on

November 1, 2023.  Under the Plea Agreement and Plea Rider,[1] Bob's advisory Guidelines range is 37 to 46 months' imprisonment, based on a total offense level of 21 and a criminal history category of I.  The Plea Rider also reflects the Government's intention to recommend a sentence of time served.  (Exh. A at 1.)

Following his guilty plea, Bob voluntarily resigned from the practice of law.  His resignation became effective May 20, 2023.[2]

## BOB WISE'S BACKGROUND

**I.    Bob's Personal History, Education, and Professional Commitment to his Clients**

Born in 1940, Bob grew up in Detroit, Michigan, in a modest home that he shared with his parents and younger brother.  (PSR ¶¶ 63–64.)  Bob's father worked for Chrysler and was the primary breadwinner, though his mother took on work in order to contribute to family finances. (*Id.*)  Bob's family was frugal, and money was "tight," though Bob never lacked for basic necessities.  (*Id.*)  Following his parents' example, Bob was raised with a strong work ethic, and he worked throughout high school to earn money for college.  (*Id.* ¶¶ 64, 90.)

Bob excelled in school and was accepted to an Ivy League university.  He instead attended the University of Michigan at a fraction of the cost, because he and his family could not

---

[1] The Plea Agreement sets forth an advisory Guidelines range of 46 to 57 months' imprisonment.  As the Government and Probation recognize, this Guidelines range is no longer correct, however, as Bob qualifies for the two-level "Zero-Point Offender" downward adjustment for first-time offenders who are not being sentenced for certain types of crimes (*e.g.*, crimes of violence, terrorism, sex offenses, etc.), which took effect on November 1, 2023.  *See* U.S.S.G. §4C1.1.  Because this amendment took effect after Bob entered into the Plea Agreement and Probation prepared the PSR, neither the Plea Agreement nor the PSR reflects this amendment or the corrected Guidelines range of 37 to 46 months' imprisonment.  The corrected Guidelines range is reflected in the Plea Rider.

In addition to U.S.S.G. §4C1.1, U.S.S.G. §5C1.1 n.10(B), which cross-references the Zero-Point Offender adjustment, provides that Bob falls within a category of defendants for whom "a departure to a sentence other than a sentence of imprisonment[] may be appropriate."

[2] *See* Order of the Appellate Division, First Department, Sept. 14, 2023, attached as Exhibit B (granting Bob's motion to resign, effective *nunc pro tunc* to May 20, 2023).

afford the Ivy League tuition.  Bob continued working multiple jobs through college, and he earned his undergraduate degree from the University of Michigan in economics in 1962, followed by his law degree in 1965.  (*Id.* ¶ 64.)  Bob also attended a master's program at the University of London and received a Master of Laws degree in 1966.  (*Id.*)

Bob moved to Manhattan and was admitted to the New York State bar in 1966.  (*Id.* ¶¶ 67, 85.)  In the early years of his career, he worked at a number of firms, and in 1982, he joined Frankfurt Garbus Klein & Selz (now Frankfurt Kurnit Klein & Selz), where he was a partner for 26 years.  (*Id.* ¶¶ 89–90.)  At the end of December 2008, when Bob was 68, he left Frankfurt Kurnit and started his own law practice in January 2009, which he maintained until this year.  (*Id.* ¶¶ 85, 88–89.)  Following Bob's guilty plea on April 25, 2023, Bob stopped practicing law and voluntarily resigned from the New York State bar.  (*See* Order of the Appellate Division, First Department, Sept. 14, 2023, attached as Exhibit B.)

Bob's area of practice was primarily conducting real estate transactions on behalf of clients.  (PSR ¶¶ 88–89.)  In connection with his clients' properties, Bob also performed ministerial property management duties, including paying bills (*e.g.*, real estate taxes, common charges, utilities, etc.), communicating with tenants and building management, and otherwise maintaining the upkeep of the properties.  This type of work was typical for Bob's international clients.

Bob "was the go-to attorney for several very well-known real estate brokers who repeatedly referred their clients to him[.]"  (Letter from Gina Manzino, Oct. 10, 2023, attached as Exhibit C-4, at 1.)  Fellow attorneys viewed him as not only a good attorney but one whose ethics were beyond reproach.  "Bob was the only real estate lawyer I referred clients to because his work was, without exception, completely professional and accurate."  (Letter from Robert

Solomon, Aug. 30, 2023, attached as Exhibit C-5, at 1.)  In 40 years of knowing him, Bob's conduct never caused "a moment of concern about his knowledge, his professionalism, his integrity or his kindness."  (*Id.* at 1.)  He was a "smart and thorough lawyer" who acted with "the highest business and personal ethics."  (Letter from Richard Hofstetter, July 20, 2023, attached as Exhibit C-6, at 2.)

More than just providing first-class legal advice, Bob has genuinely cared for his clients and colleagues.  Gina Manzino, who has known Bob for over 40 years, started her career as Bob's secretary at Frankfurt Kurnit, moved to the paralegal department there under Bob's tutelage, and is now a Senior Vice President at a large national bank.  (Exh. C-4 at 1–2.)  She writes, "Bob was a patient teacher and we quickly became a great team.  [He] was my mentor and taught me so much about conduct in the business world and discretion with client matters."  (*Id.* at 1.)  Bob eventually invited Gina and her husband to his home for dinner "where our relationship blossomed from merely colleagues to friends."  (*Id.* at 2.)  Bob supported Gina through two career transitions, and she "truly believe[s] that were it not for Bob's patient mentoring and guidance, I would not be where I am today.  I am eternally grateful to him."  (*Id.*) "The offense to which he has plead[ed] is not in line with the man I have known for four decades, who has led an exemplary life, both personally and professionally."  (*Id.*)

Toni Pagano Rosenfeld, a client of Bob's for over 30 years, writes:

> The Bob Wise I know has handled every move I've made in real estate and has done it letter perfect and according to the law.
>
> He is honest, honorable, patient and always takes the time to answer questions in plain English.
>
> Over the years, [Bob] has gone above and beyond the call of duty to be helpful which is a rare quality.  He has really helped me beyond what a lawyer would do and is very kind.  On one occasion, I needed help with an important problem, and I reached out to dozens of friends and relatives.  Nobody came to my assistance – not even my

> own sisters – except for Bob, and he made it so easy for me.  I have
> never forgotten that.
>
> Over the 30 years that I've been his client, I've given him Power of
> Attorney three times because I knew he was an honorable person
> whom I could trust.

(Letter from Toni Pagano Rosenfeld, attached as Exhibit C-7, at 1.)  In furtherance of his

commitment to his profession and serving clients, Bob also performed work without charging

clients.  One author recalls how Bob refused payment from her for representing her in clarifying

her copyright rights, knowing that she was in a tough financial situation.  (Letter from Wyatt

Harlan, Aug. 18, 2023, attached as Exhibit C-8, at 1 ("Bob wouldn't accept a thing from me in

return: no wine, no gift, nothing.").)

Matt Pedone, who has known Bob for over 25 years, initially as a client, writes:

> While also professional, [Bob] also took a paternal interest in me
> and my family.  We relied on his expertise and advice [for multiple
> real estate transactions].  Bob went beyond just supplying legal
> advice to me and my business partner . . . .  He looked after us in the
> same way he did for [my wife] and I.  . . .  One example of my
> special connection to Bob was when my wife, Katharine and I were
> refinancing our home to help pay for our youngest, Wesley, to attend
> Wash U.  Since we were doing the closing at our home, Bob
> suggested Wesley attend the closing.  Bob came early to explain
> everything to Wes.  He did it in a way that was not too intimidating
> but still let Wes know the weight of the proceedings.  We were truly
> touched by his effort, not just as a lawyer, but as a friend.  After
> more than 25 years, Bob had gone from my dad's real estate
> attorney, to a trusted friend who has always looked after us.

(Letter from Matthew Pedone, July 23, 2023, attached as Exhibit C-9, at 1–2.)

Peter Kolodny, a fellow attorney, had occasion to represent Bob in an action to recover

legal fees.  Mr. Kolodny noted that Bob's work clearly reflected diligence and competence, and

that representing Bob "was a pleasure since he was easy to deal with and had reasonable

expectations."  (Letter from Peter Kolodny, Sept. 27, 2023, attached as Exhibit C-10, at 1.)

Bob's "good sense of humor and an aura of kindness" came through even in conversations with

Mr. Kolodny's assistant.  (*Id.* at 2.)

## II.  Bob's Devotion to his Family and Critical Support to his Wife

Bob has always been deeply devoted to his family.  He is a loving husband and father, a

role model to his younger brother, and a caretaker to his aging mother in her final years and now

to his wife.

As Bob's brother, James, describes:

> Throughout our childhood and young adulthood, my brother was
> often my guide and role model.  In high school, Bob advised me to
> join the newspaper and Cross Country team, as I was more quiet and
> less outgoing than he.  We both attended the University of Michigan
> for college and our respective graduate schooling.  He was happy to
> help me get jobs in the architectural library and cooking in a sorority
> house to help pay for part of my housing and tuition.  At this time,
> his love of cooking and baking grew and flourished.  He would often
> invite me over to his apartment for dinners, so he could try new
> recipes and share his food with his friends and family.  Cooking and
> baking continue to be a significant way for Bob to connect and give
> to those he cares about.

(Letter from James Wise, Oct. 16, 2023, attached as Exhibit C-11, at 1.)[3]

Some years after Bob moved to New York in 1966, he attended a New Year's Eve party

for avid cyclists.  (PSR ¶ 65.)  As it turns out, Bob shared this passion with his future father-in-

law, who had brought his wife and his daughter, Kathleen, to the party with him.  Bob and

Kathleen dated for a few years after meeting that night, and they married in October 1974.  (*Id.*)

Kathleen, who turned 81 on November 5, is a retired social worker.  (*Id.*; Letter from Kathleen

Friend, Nov. 20, 2023, attached as Exhibit C-1, at 1–2.)  As a partner to Kathleen, Bob has

---

[3] Several people writing in support of Bob mentioned his love of sharing his cooking and baking.  (Exh. C-2 at 3; Exh. C-4 at 1 ("[H]e and Kathleen are great chefs!"); Letter from Karen McCabe, Oct. 11, 2023, attached as Exhibit C-14, at 1.)

always done the grocery shopping and the majority of the cooking, as well as all repairs and maintenance around the house, and he has taken on more responsibilities as Kathleen's health has deteriorated (described below).  (Exh. C-1 at 2; Letter from Alyssa Wise, Oct. 15, 2023, attached as Exhibit C-2, at 6; Letter from Gregory Wise, Nov. 17, 2023, attached as Exhibit C-3, at 2.)

Bob and Kathleen have two children together, Alyssa and Greg, who are now in their 40s and live in Nashville and Atlanta, respectively.  (PSR ¶ 66.)  As a parent, Bob coordinated his schedule with Kathleen's to care for their children, including "com[ing] home early so that he could give the children dinner while [Kathleen] returned to the office for evening hours."  (Exh. C-1 at 2.)  Bob and Kathleen had a true partnership—then and now—and Bob arranged his life around his family, always prioritizing them.

Letters from Alyssa and Greg make clear that their father always wanted the best for his family and put their needs before his own.  An emblematic example from Alyssa's childhood is when Bob went into some deep bushes near their home to retrieve a ball she had lost.  He emerged victoriously with her ball—but also numerous hornet stings—and pretended to be completely fine.  Only years later would Alyssa learn from her mom that those stings were incredibly painful, but Bob would never let on to his daughter that helping her could be the cause of any kind of pain.  (Exh. C-2 at 1.)

Alyssa and Greg both observe that their father has always valued hard work and being able to provide them with opportunities that he never had.  (Exh. C-2 at 2–3; Exh. C-3 at 1.)  As one example, he took the kids skiing, despite having no personal experience with the sport, and Alyssa has since grown to be an avid skier.  (Exh. C-2 at 2.)  As another, although Bob could not attend the college of his choice because of finances, he made sure that Alyssa and Greg would

not confront that limitation.  When Alyssa decided to pursue graduate school, Bob assured her again that she should go where she wanted, and he would figure out how to pay for it.  (*Id.*)

Alyssa and Greg both recall weekend brunches prepared by Bob after early morning trips to the grocery store, his attendance at countless events, whether soccer games or ultimate frisbee tournaments, and practical but thoughtful gifts to improve their everyday lives, like winter gloves and handy kitchen gadgets.  (*Id.* at 1–3; Exh. C-3 at 1.)

Bob has always sought to be a source of support and to provide opportunities to his family.  He dreads being a burden to anyone.  In fact, even when ███████████████████ ██████████████████████████████████, he did his utmost to shoulder those burdens alone.  (Exh. C-2 at 4 ("While I knew generally that he had been experiencing multiple health issues for some time, it was only through documenting information for Probation that I learned the full extent of medical challenges he has been suffering from.  But that is exactly like him, to try to carry the full weight of any family burden on his own so that we (my mother, my brother, and I) would not be negatively impacted.").)

Now grown adults, Alyssa is ████████████████████████ ███████████████████████████████████████████ ██████████████████████████████ █████████████████████████████████████ █████████████████████  Even now, Bob supports them in small, thoughtful gestures like sending Alyssa packets of yeast during the pandemic (a scarcity at the time) to support their shared hobby of baking.  (Exh. C-2 at 3.)

In 2008, Bob's mother's health took a turn for the worse, and he and Kathleen cared for her in the years before she passed in 2012.  As Bob's brother writes:

> In 2008, Bob, with Kathleen's support, moved my mother from Michigan to New York so that she could be in a retirement facility that was close to family. Bob and Kathleen showed her great love and patience during her final years, despite her declining health and memory. They would visit her frequently, bringing her news of the family, which would help her mood and decrease her stress in her final years. She lived to the age of 97, and they were by her side as her days were winding down.

(Exh. C-11 at 2.)

As they have aged together, Bob and Kathleen have become interdependent and each is the sole caretaker of the other. Neither is physically strong or capable of managing alone, but together they can and do. Kathleen suffers from a number of medical conditions. (PSR at 37.) Day to day, ███████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

██████████████████████████████ ██████████████████████████████

███████████████████████████████████████████████████████████

███████████████ In addition to these conditions that affect her every day, ████████████████

███████████████████████████████████████████████████████████

████████████████████████████████████████████████

Bob, despite his own infirmities (described below), is the primary caretaker of Kathleen and their household. (PSR at 37.) In his absence, Kathleen would require in-home care. "Kathie has had numerous serious medical problems, as has Bob, and as such, given their

---

[4] Kathleen's medical record notes ████████████████████████████████████████

████████████████████████████████████████████████████████████████

█████

respective ages it would be almost impossible for her to manage on her own." (Letter from

Susan Eluard, Oct. 5, 2023, attached as Exhibit C-12, at 1.)

> For many years Bob has been the more physically active person who does almost all of the heavy physical tasks of the household. My sister [Kathleen] would find it hard to manage if he were not present. . . . Kathleen has relied on Bob to do many of the activities of daily living such as the shopping for groceries, all financial dealings and accounting, as well as being her primary companion ██████████ ██████████████████ I worry that she will have a very difficult time living independently if Bob were to be incarcerated.

(Letter from Robert Friend, Nov. 17, 2023, attached as Exhibit C-13, at 3. *See also* Letter from

Karen McCabe, Oct. 11, 2023, attached as Exhibit C-14, at 2 ("Also in her 80's, Kathleen has

███████████ and other health problems, and relies on Bob for assistance, as he also does on

her. . . . Neither of their two children are able to provide the level of help that Bob and Kathleen

provide to each other.").)  Bob's former law partner and friend, Richard Hofstetter, believes that

given their "serious medical issues," "Bob's incarceration will be devastating both to him and for

his wife's health and wellness." (Exh. C-6 at 2–3.)

Bob's inability to shield his family from the consequences of this matter—and in

particular the impact on Kathleen should he be sentenced to a term of imprisonment—has been

an incredible source of distress to Bob.  He is fearful of what will happen to Kathleen in his

absence.  Bob does not want his actions or circumstances to burden his family, even in his

moments of greatest suffering.  As Alyssa describes:

> My dad has always been the rock for all of us, the person I knew I could go to with any question or problem to get support and a clear path for resolving it.  Not having that source of stability as I have changed jobs, home, and city has made this transition much more challenging.  And yet still, despite everything going on for him, when he found out I was having a hard time getting a car, he got the clutch repaired on his old Honda and had it sent out to me.  It felt like a moment from the children's book "The Giving Tree," where the tree repeatedly gives away parts of herself to meet the needs of

the boy; no matter what, as long as he is able, my dad will be there
for me and give me anything he has left to give.

(Exh. C-2 at 5.)

### III.    Bob Has Serious Medical Problems and Needs Constant Care.

In his 83 years, Bob has accumulated well more than a lifetime's worth of medical

conditions, and his ailments and medical needs are mounting.  Bob is stoic and tends to minimize

the impact of his medical issues, yet it is apparent that he suffers seriously.  His medical

conditions require daily attention and regular intervention, and any number of his conditions may

require emergency treatment at any moment.  ████████████████████████

████████████████████████████████████████████████

████████████████████

#### A.    Bob Has Suffered Significant Medical Events.

Three major medical events in Bob's life stand out:  ████████████████

████████████████████████████████████████████████

████████████████.  None of these situations was straightforward, and each has led to

recurring issues and/or the need for ongoing treatment and care.

████████████████████████

████████████████████████████████████████

██████████████████████████████████

██████████████████████████████████

████████████████████████████████████

██████████████████████████████████

███████████████████████████████████

████████████████████████████████████

██████████████████████████████████████







**B.      Bob's Need for Emergency Care**

In addition to these three major medical events and chronic conditions, Bob has required emergency care and attention on a number of occasions.  (*See* Letter from Dr. Kenneth Croen, Oct. 23, 2023, attached as Exhibit E-4.) ████████████████████████████ ████████████████████████████████████ Bob fears what will happen to him in prison if he requires more emergency care, which seems likely.





**C.**      **Bob Has Chronic Conditions that Require Ongoing Medical Care.**

In addition to these three major medical events and numerous medical emergencies, Bob has a number of other medical conditions and problems that require ongoing monitoring and care.



---

[5] Bob was recently prescribed this medication and started taking it on November 19.



Consistent with Bob's extensive need for ongoing medical care, he currently has the following appointments scheduled, or is waiting to confirm a date in the near term:



As is plain, Bob's medical problems are serious, extensive, and ongoing.

## OFFENSE CONDUCT

**I.    The Payments Bob Made that Constituted the Offense Conduct Were Previously Lawful and Facially Innocuous.**

In approximately 2005, Bob was referred a new client, Vladimir Voronchenko, who retained Bob to assist with certain real estate transactions.  Bob ultimately represented Voronchenko for 17 years and assisted him in the acquisition and management of various real estate properties, including by making payments for utilities, maintenance, and other routine expenses.

In 2008, Bob represented Voronchenko in connection with the purchase of a residence in Manhattan, through Medallion.  Bob learned at that time that although Voronchenko, Bob's client, would reside in the property, another person named Viktor Vekselberg would beneficially

own the property.  Bob, who has never interacted with Vekselberg or any Vekselberg agent, understood that Vekselberg was someone with whom Voronchenko had a professional and close personal relationship.  This was a decade prior to sanctions and 14 years prior to Bob's knowledge of any government investigation, and the fact that Vekselberg was the beneficial owner of the property was unremarkable and made no distinct impression upon Bob.

For over a decade following the purchase of this property through Medallion in 2008, Bob continued to perform work for Voronchenko, including the purchase of other properties through Medallion and paying property-related bills.  Bob's work for and relationship with Voronchenko was unexceptional, and Bob's hourly rate for this work (no more than $350) was the same as that for his other clients.

In that decade from 2008 to 2018, Medallion and its properties appeared to Bob to be under the sole control of the Voronchenko family: the Voronchenkos lived in the properties; their kids grew up there; and they decided on purchases, renovations, furnishings, and more.  The Voronchenkos were the only ones who provided Bob with direction about the Medallion properties, with no indication that anyone else's approval was sought or required.  In Bob's view, Medallion and the Voronchenkos were substantially one and the same.[6]

On April 6, 2018, OFAC designated Vekselberg as an SDN.  Under federal law, it is unlawful to conduct financial transactions for the benefit of an SDN, and such conduct constitutes a sanctions violation.  In the instant case, the Government alleges—and we accept— that through a complicated corporate structure unknown to Bob, Vekselberg was the ultimate

---

[6] Bob also represented Voxi, the other corporate entity at issue in this case, but is less familiar with it.  While he also understood Voxi to be synonymous with the Voronchenkos and under their sole control, he did not represent Voxi in any real estate closing and had far fewer transactions relating to Voxi than Medallion.  Those limited transactions related to utility bills, pool maintenance, landscaping, and payments to Fisher Island entities.  Bob has minimal insight into how other Voxi transactions were handled or paid.

beneficial owner of the properties at issue in this case at the time that sanctions were imposed. As a result, it became illegal for Bob to conduct financial transactions for the maintenance of the Medallion and Voxi properties.  Consequently, conduct in which Bob had been engaging for over a decade—paying bills—transformed overnight from perfectly legal into criminal activity.

## II.    Bob Gradually Developed an Awareness of Wrongdoing.

In April 2018, Bob did not immediately connect the dots and realize that his continued payments on behalf of certain properties for Voronchenko had just become illegal.  Medallion— the entity through which Bob had purchased properties for Voronchenko—had existed for over a decade, and Voxi, another entity primarily handled by other attorneys, had existed for four years. These were not entities that were created following the imposition of sanctions specifically to disguise the fact that an SDN owned them.  Rather, it seemed to be business as usual.

Significantly, Bob was extremely ill in April 2018 when Vekselberg was sanctioned,



As Kathleen's brother observed, this undoubtedly impacted Bob's understanding and appreciation of events at the time.  (Exh. C-13 at 2 ("During the time that the Russian oligarch was officially announced as being sanctioned by the U.S. government,

.").)[7]

---

[7] Many who have known Bob for decades remarked that his judgment may have been affected during this time period. (*See, e.g.*, Exh. C-14 at 1–2 ("My husband John and I are convinced that if he had not been struggling with several serious health problems around 2018, . . . he would have recognized the legal danger in which he had suddenly become enmeshed. . . . [I]t's our guess that his health situation caused him to be unaware that the legal landscape had changed or he would have immediately taken steps at that time to correct the situation."); Exh. C-11 at 2 ("In the last 10 years Bob has had several major health issues[.] . . . I've had ongoing concerns that he may not have taken enough time to recuperate from these issues and it may have affected his judgment and decision making.").)

████████████████████████ Bob "resumed work sooner than he should have out of his desire not to let down his clients," recalls Bob's wife, Kathleen.  (Exh. C-1 at 1.)  In the following months, Bob learned through the news that Vekselberg had been sanctioned, yet even then he did not immediately recall information he had learned from a decade prior that Vekselberg was the beneficial owner of Voronchenko's properties.  Bob certainly did not make the connection at the time that the tasks he was performing—making ministerial payments—were criminal.

Slowly, however, certain actions came to his attention that raised questions and gave Bob pause.  For example, Bob noticed changes in the source of funds he received from Voronchenko.  He was also told things that were inconsistent with information he had previously been provided; for example, ████████████████████████████████████████████████ ███████████████████████████████████.  Bob initially questioned Voronchenko and his family members about these issues, but when Bob was ignored or received circumspect answers, he eventually stopped asking questions in spite of his ongoing concerns.  He nonetheless continued making payments.  That was a grave mistake for which Bob accepts full responsibility and that he will forever regret.

As Bob allocuted to the Court at his plea proceeding:

> In about 2008, I began representing an entity affiliated with Mr. Voronchenko named Medallion, Inc.  In the course of the purchase of real estate on behalf of Medallion, I was advised that Medallion was beneficially owned by Viktor Vekselberg. . . . In April of 2018, Vekselberg was sanctioned by the US government.  I learned of this fact at some point in the months that followed.  While I don't remember focusing at the time on the fact that I had been told in 2008 that Vekselberg was the beneficial owner of Medallion[,] and I had not thought about the ownership of Medallion for years, as time passed following the imposition of sanctions, I observed certain events that caused me to think that Vekselberg was still the beneficial owner of Medallion. . . . I then ultimately made a

conscious decision not to press the issue and failed to confirm what was very likely the case — namely, that Vekselberg was still the beneficial owner of the properties.  Instead, I continued to use the funds that were provided to me to make the payments that benefited the properties through June of 2022.  I understand that by continuing to make these payments for these properties, despite realizing the high probability that Vekselberg was the beneficial owner of the properties, I was passively agreeing with others to use overseas funds to promote the violation of U.S. sanctions.  What I did was wrong and it was illegal.  I am saddened and very sorry for my actions.

(Dkt. 9, Plea Transcript, at 39–40.)

In the face of these accumulating red flags, Bob did not confirm what he believed was likely the case and ultimately continued serving a more-than-decade-long client relationship.  In total, Bob received approximately $210,441 in legal fees from Voronchenko following the sanctions imposed in April 2018.

### III.   The Government Acknowledges Bob's Minor Role in the Offense.

Bob accepts full responsibility for his criminal conduct.  Prior to the plea, he met with the Government on two occasions and answered their questions to the best of his ability.  He ultimately pleaded guilty pursuant to an Information, enabling the Government to avoid additional investigation of his conduct, the need to seek an indictment from the Grand Jury, and the need to produce discovery and litigate the case.

The Government recognized that Bob's criminal conduct was atypical, and that given Bob's lesser culpability than others involved in the offense, he was entitled to a "Minor Role" adjustment under §3B1.2(b) of the Sentencing Guidelines: he lacked understanding of the scope and structure of the criminal activity; he did not participate in planning or organizing the criminal activity; he did not exercise any decision-making authority or influence such exercise; he is the most minor participant in the commission of the criminal activity (where the acts he performed were at others' direction and appeared to be legal on their face); and he did not stand to benefit

25

from the criminal activity, except through his standard fee for work performed, with no particular benefit deriving from the criminal nature of any work.  *See* U.S.S.G. §3B1.2 "Mitigating Role," Application Note 3(C).

Consistent with his minor role, and as the Government concurs, Bob was not aware of many of the facts alleged by the Government to comprise the charged criminal conduct.  (PSR at 34 (Government concurring with defense counsel's position "with respect to facts of which Wise was unaware," referring to numerous paragraphs describing "The Offense Conduct" (PSR ¶¶ 12–19, 21, 33, 36–38)).)  Among other things, Bob was unaware of the structure of shell companies ultimately establishing beneficial ownership by Vekselberg; he did not know of any of the Government's alleged post-sanctions communications involving Voronchenko (including seeking out OFAC attorneys); and he did not know about Voronchenko's departure from the United States until the Indictment against him was unsealed.  (*Id.*)  Indeed, Bob has and is relying on the Government's representation that Vekselberg was, in fact, the beneficial owner of Medallion and Voxi at the time and after Vekselberg was designated an SDN—a fact that is the subject of dispute in the Government's civil proceeding to forfeit Medallion and Voxi properties.  *See United States v. 19 Duck Pond Lane*, No. 23 Civ. 1545, Dkt. 37 (Status Report) at 5 (S.D.N.Y. Aug. 11, 2023) (JGLC).[8]

## RELEVANT SENTENCING CONSIDERATIONS

## I.    Applicable Legal Standard

When sentencing individuals, the Court must fashion a sentence that is "sufficient, but not greater than necessary, to achieve the overarching sentencing purposes of retribution,

---

[8] The Status Report submitted in *19 Duck Pond Lane* reflects the position taken by Medallion and Voxi that their beneficial owner is not Vekselberg, but rather, the "Transoceanic Trust," of which Voronchenko is "a" beneficiary. *Id.*  Upon information and belief, this issue will be the subject of discovery in that action, including overseas discovery.

deterrence, incapacitation, and rehabilitation." *Rosales-Mireles v. United States*, 138 S. Ct. 1897, 1903 (2018) (internal citations and quotation marks omitted); *see also* 18 U.S.C. § 3553(a).  In doing so, the Court considers "the nature and circumstances of the offense and the history and characteristics of the defendant, as well as the need for the sentence imposed to serve the four overarching aims of sentencing." *Dean v. United States*, 137 S. Ct. 1170, 1175 (2017) (internal citations and quotation marks omitted).

"It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Koon v. United States*, 518 U.S. 81, 113 (1996).  The sentencing factors outlined in 18 U.S.C. § 3553(a) took on renewed vitality in the aftermath of *United States v. Booker*, 543 U.S. 220 (2005), which "requires sentencing courts to treat the [Sentencing] Guidelines only as a starting point, and then to craft an appropriate sentence taking full account of 'the history and characteristics of the defendant.'" *United States v. Preacely*, 628 F.3d 72, 84 (2d Cir. 2010) (Lynch, J., concurring) (quoting 18 U.S.C. § 3553(a)(1)).  Indeed, while "[t]he court must . . . consider the pertinent guidelines and policies adopted by the Sentencing Commission," *Dean*, 137 S. Ct. at 1175, it may not "presume that a Guidelines sentence is reasonable," *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (en banc).

Thus, the Court, in fashioning an appropriate sentence, shall consider the following:

    (1) the nature and circumstances of the offense and the history and characteristics of the defendant; [and]

    (2) the need for the sentence imposed –

        (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

        (B) to afford adequate deterrence to criminal conduct;

      (C) to protect the public from further crimes of the defendant; and

      (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

U.S.C. § 3553(a)(1), (2); *see Cavera*, 550 at 189 (requiring courts to perform an "independent review of the sentencing factors" in each case); *Rita v. United States*, 551 U.S. 338, 367 (2007) (Stevens, J., concurring) (the Guidelines are "truly advisory").

Upon consideration of the relevant factors, and despite an advisory Guidelines range of 37–46 months, Probation recommends that Bob receive a sentence of time served, followed by one year of supervised release, and no fine. (PSR at 36.) The Government intends to make the same recommendation for a sentence of time served. (Exh. A at 1.) Respectfully, we implore the Court to follow these recommendations.

## II. A Variance from the Advisory Guidelines Range is Warranted, as the Sentencing Guidelines Place Undue Emphasis on the Value of Laundered Funds.

As an initial matter, Bob's advisory Guidelines range should carry little weight in the Court's determination of an appropriate sentence; this range is driven primarily by an enhancement that bears little to no relationship to Bob's culpability or to any harm caused.

The applicable Guidelines provision for conspiracy to commit money laundering, U.S.S.G. §2X1.1, refers to the substantive money laundering provision, U.S.S.G. §2S1.1, which in turn calls for a base offense level of 8. U.S.S.G. §2S1.1(a)(2). (PSR ¶ 47.) The base offense level is increased, however, by reference to the loss table set out in §2B1.1 based on "the value of the laundered funds." (*Id.*) Here, the parties agreed to a value of approximately $3.77 million, which is the sum of payments Bob made on behalf of properties beneficially owned by Vekselberg after he was sanctioned. Because this number falls between $3.5 and $9.5 million on the Guidelines loss table (*see* U.S.S.G. §2B1.1(b)(1)(J)), Bob's offense level is increased by 18.

(*Id.*)  Upon the application of several other adjustments, Bob's total offense level comes to 21. (*Id.* ¶¶ 50–57; Exh. A at 1.)[9]

The "loss table" that drives Bob's offense level calculation is found in the theft and fraud section of the Guidelines.  As its name suggests, the conceptual purpose of that table is to capture "actual loss," "intended loss," or, if loss cannot be calculated, the "gain" from the offense. U.S.S.G. § 2B1.1, Application Note 3(A).  While those measures may correlate to culpability in many fraud-based offenses, in this case, no victim suffered monetary loss, and there is no relationship to any gain to Bob.  Rather, the dollar value is derived from facially innocuous property-related expenses that Bob paid on behalf of the Voronchenko family from April 2018 to June 2022.  Those include:

| | | |
|---|---|---|
| 1. | Real Estate Taxes | $939,025.63 |
| 2. | Common Charges | $847,010.84 |
| 3. | Various Charges Paid to Fisher Island | $630,920.52 |
| 4. | Insurance Premiums | $451,187.31 |
| 5. | Utilities | $333,316.88 |
| 6. | Grounds Care | $101,765.38 |
| 7. | Household Maintenance and Repairs | $82,367.52 |
| 8. | Holiday Gratuities to Building Staff | $49,050.00 |

---

[9] Bob's offense level is increased 2 levels pursuant to §3B1.3 for special skill and/or abuse of trust, and reduced 2 levels pursuant to §3B1.2 for minor participant, 2 levels pursuant to §4C1.1 (effective November 1, 2023) for being a zero-point offender, and 3 levels pursuant to §3E1.1 for acceptance of responsibility.

Of the departures that bring Bob's total offense level from 26 to 21, of particular note is the newly enacted "Zero-Point Offender" adjustment under §4C1.1.  This adjustment provides for a two-level reduction for first-time offenders who have not committed certain types of crimes (*e.g.*, crimes of violence, sex offenses, terrorism, etc.). Application Note 10 to §5C1.1 ("Imposition of a Term of Imprisonment") further provides:

> A departure, including a departure to a sentence other than a sentence of imprisonment, may be appropriate if the defendant received an adjustment under §4C1.1 (Adjustment for Certain Zero-Point Offenders) and the defendant's applicable guideline range overstates the gravity of the offense because the offense of conviction is not a crime of violence or an otherwise serious offense.

This commentary provides further support for the non-incarceratory sentence of time served that is recommended here.

These categories—including nearly $1 million in tax payments to the local, state, or federal governments—constitute $3,434,644.08 of the roughly $3.77 million in funds that Bob disbursed. When coupled with the fees Bob earned based on his standard hourly rate, *i.e.*, the $210,441 that he will pay in full satisfaction of the forfeiture order entered in this case, that sum constitutes nearly the entirety of the funds at issue. The remaining funds were spent in *de minimis* amounts in equally mundane maintenance categories.

It is difficult to see how any of these payments, or their aggregate sum, reflect useful information relevant to sentencing. Yet it is *by far* the single most impactful factor in Bob's Guidelines calculation—ultimately increasing his Guidelines range more than ten-fold.[10] As such, it clearly overstates the gravity of Bob's conduct.[11]

---

[10] Based on criminal history category I, the base offense level of 8 for money laundering crimes yields a range of 0–6 months' imprisonment. Adding 18 levels yields a range of 63–78 months' imprisonment.

[11] Even in theft and fraud cases, where the loss table serves its intended purpose, the Second Circuit has repeatedly recognized the outsized impact of the loss enhancement and cautioned courts to give greater consideration to downward variances where the Guidelines offense level is driven primarily by loss amount. *See, e.g., United States v. Algahaim*, 842 F.3d 796, 800 (2d Cir. 2016) (criticizing the Sentencing Commission's approach in "assign[ing] a rather low base offense level to a crime and then increas[ing] it significantly by a loss enhancement," which in that case resulted in a "three-fold increase" in the Guidelines range for one defendant, and vacating the sentences for "further consideration" of "whether the significant effect of the loss enhancement, in relation to the low base offense level, should result in a non-Guidelines sentence"); *United States v. Corsey*, 723 F.3d 366, 377–378 (2d Cir. 2013) (Underhill, J., concurring) (recognizing that "the loss guideline is fundamentally flawed," and noting that district judges are "without meaningful guidance in high-loss [fraud] cases"); *United States v. Gupta*, 904 F. Supp. 2d 349, 351 (S.D.N.Y. 2012) ("The Guidelines' calculations for [securities fraud cases] . . . reflect an ever more draconian approach to white collar crime, unsupported by any empirical data. . . . By making a Guidelines sentence turn, for all practical purposes, on this single factor [the amount of monetary loss or gain occasioned by the offense], the Sentencing Commission effectively ignored the statutory requirement that federal sentencing take many factors into account, and, by contrast, effectively guaranteed that many such sentences would be irrational on their face.") (internal citation omitted); *United States v. Emmenegger*, 329 F. Supp. 2d 416, 427 (S.D.N.Y. 2004) (condemning the "excessive weight on [the fraud loss] factor" and noting that the amount of loss is a "relatively weak indicator of the moral seriousness of the offense or the need for deterrence"); *United States v. Lumiere*, No. 16 Cr. 483, Dkt. 115 at 27–28 (S.D.N.Y. June 27, 2017) (JSR) (commenting that the case "once again demonstrate[d] the absurdity of the sentencing guidelines" and that "[t]hese draconian penalties bear no relationship, in the Court's view, to any of the factors set forth in Section 3553(a): just punishment, the nature of the person's offense, and the nature of the person's character, the need for specific and general deterrence or not.").

**III.    Application of § 3553(a) Factors Demonstrate that a Non-Custodial Sentence Is Just and Appropriate.**

This is a case where the Section 3553(a) factors overwhelmingly support a below-Guidelines, non-incarceratory sentence.  Bob's criminal conduct was an aberration—a complete departure from how he has otherwise lived his life, characterized by his strong character, integrity, and work ethic, as well as his commitment to his family, friends, and clients.  Neither the public nor Bob will benefit through his incarceration.  Significantly, Bob, at 83, suffers from significant medical problems and has extensive medical needs, which have been growing by the day.  He also provides critical care for and support to his wife, who suffers from various medical conditions and physical constraints of her own.  The two have become interdependent and while both are weak and unable to manage alone, together they can.

Bob's family, friends, former colleagues, and clients appeal to the Court to allow him to remain free from incarceration.  A prison sentence would be unjust, and even a short prison sentence means that Bob will likely never return home.

**A.    Bob's Personal History and Characteristics Warrant a Non-Incarceratory Sentence.**

**1.    Bob's Elderly Age and Serious Medical Conditions Support a Non-Incarceratory Sentence.**

At 83, Bob suffers from more medical conditions and ailments than most people face in their lifetime.  For this reason, Probation agrees that "based upon the medical conditions of both the defendant and his wife . . . any sentence which includes a term of incarceration would be 'unduly harsh.'"  (PSR at 38.)   In its recommendation, Probation concludes that "a custodial sentence would [not] serve the interests of justice in this case in light of the defendant's advanced age, extensive physical health issues, lack of criminal history and minor participation in the offense."  (*Id.*)

As an initial guidepost, the Guidelines themselves contemplate departures based on age and medical considerations: "Age may be a reason to depart downward in a case in which the defendant is elderly and infirm and where a form of punishment such as home confinement might be equally efficient as and less costly than incarceration.  Section 5H1.1 ("Age (Policy Statement)").  *See also* Section 5H1.4 ("An extraordinary physical impairment may be a reason to depart downward; *e.g.*, in the case of a seriously infirm defendant, home detention may be as efficient as, and less costly than, imprisonment.")[12]

Bob's Plea Agreement does not authorize advocacy for a downward departure, yet the same rationale applies to consideration of a downward variance.  Indeed, it is not uncommon to vary downward based on a defendant's medical conditions, particularly where a defendant had a minor role in the offense and/or the criminal conduct was an aberration.  *See, e.g.*, *United States v. Jacoby*, No. 17 Cr. 676, Dkt. 19 at 11–13 (S.D.N.Y. Feb. 27, 2018) (DLC) (imposing sentence of time served followed by two years of supervised release on defendant in his mid-sixties, where sentencing judge was "very influenced here by [defendant's] health" and aberrational nature of the offense "compared to the entirety of [defendant's] career."); *United States v. Smalling*, No. 12 Cr. 61, Dkt. 120 at 3 (E.D.N.Y. Mar. 31, 2014) (JBW) (sentence of three years' probation was warranted based on defendant's "minor role" and health conditions including Type

---

[12] These policies are reiterated by the Guidelines' statements on reductions in terms of imprisonment for defendants already sentenced and incarcerated.  Section 1B1.13(b) describes "Extraordinary and Compelling Reasons" that warrant a sentence reduction.  These include the "Medical Circumstances of the Defendant" and "Family Circumstances of the Defendant."  As to medical circumstances, extraordinary circumstances include where "[t]he defendant is—(i) suffering from a serious physical or medical condition, (ii) suffering from a serious functional or cognitive impairment, or (iii) experiencing deteriorating physical or mental health because of the aging process— that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover," or where "[t]he defendant is suffering from a medical condition that requires long-term or specialized medical care that is not being provided and without which the defendant is at risk of serious deterioration in health or death."  U.S.S.G. §1B1.13(b)(1)(B) and (C). Family circumstances include "[t]he incapacitation of the defendant's spouse or registered partner when the defendant would be the only available caregiver for the spouse or registered partner."

I diabetes and a 2007 kidney transplant surgery requiring "ongoing treatment," such that "[i]ncarceration would cause her special hardship").  Even in cases involving far more egregious criminal conduct than that present here, courts have found downward variances appropriate based on medical conditions.  *See United States v. Rodriguez*, No. 20 Cr. 513, Dkt. 116 at 12, 43, 45, 48 (S.D.N.Y. Dec. 16, 2022) (AT) (varying downward from the agreed-upon Guidelines range of 97–121 months and sentencing defendant principally to five years' probation with a special condition of home confinement, based in part on her "complex and severe medical condition," despite conducting "the worst fraud scheme" the court had seen where the defendants scammed "poor, vulnerable people . . . and caused tremendous anguish").

Bob's medical situation warrants a variance to a non-incarceratory sentence.  As described above, he has extensive medical problems covering a wide range of issues, for which he requires ongoing regular and emergency care from an array of medical providers.  If incarcerated, Bob would be unable to receive the same type of care with the same reliability, which could have grave outcomes.  Jason A. Terris, a former administrator of the Bureau of Prisons ("BOP") for over 28 years, reviewed Bob's medical history and needs.  He determined that Bob would receive "the highest medical Care Level classification in the BOP" based on his complicated and serious medical conditions, and therefore would be designated to one of only six Federal Medical Centers ("FMC") nationwide, "out of a total of 122 prison facilities operated by the BOP throughout the country."  (Terris Declaration, attached as Exhibit F, ¶¶ 43, 45.)  Mr. Terris further concluded that "the logistical and care-related challenges Mr. Wise faces if sentenced to a term of incarceration could seriously and even dangerously jeopardize his health and well-being."  (*Id.* ¶ 14.)

The harm to Bob would manifest in several ways.  First, medical appointments for inmates—even those housed at FMCs—are frequently delayed or canceled due to staffing shortages at the BOP, a longstanding issue that has reached a critical level.  Second, Bob would not be able to receive continuity of care from the same medical team already familiar with his conditions and history, and instead would see a rotating cast of physicians on an ad hoc basis. Third, because of Bob's age and medical fragility, he is particularly susceptible to infectious diseases, which spread rapidly in prison environments, ███████████████████ ███████████████████████████████████████████.  Finally, while there are programs and incentives available to inmates that could reduce prison time by as much as two years, Bob would likely be ineligible for these, simply due to his medical appointments and needs.

For BOP inmates, routine medical appointments with specialists are frequently delayed or canceled simply because there is no BOP staff available to take inmates to see their doctors. Medical appointments require inter-departmental coordination and "at least two available armed BOP corrections officers to escort [the inmate] in handcuffs and leg irons to his various medical appointments."  (*Id.* ¶ 62.)  However, because "medical care treatment, while of course important to the BOP, will always be secondary to the security at the prison facility," escort staff may need to fill vacant security posts on any given day.  (*Id.* ¶¶ 60, 82.)  This "could complicate and interfere with Mr. Wise's medical treatment, no matter how essential" (*id.* ¶ 82), and given his need for essential emergency care—████████████████████████████ ██████—"[a]ny BOP staffing issues at an FMC that impede or delay access to such outside treatment could be detrimental or even fatal to Mr. Wise" (*id.* ¶ 58).

Even on days when staffing is sufficient, Bob's care will be disrupted.  He will no longer be able to see his current physicians and would most likely receive care from a "rotating cast of different medical providers and specialists who happen to be working on any particular day in the medical community near his designated BOP facility," "regardless of the level of experience or degree of expertise those medical care providers may have regarding Mr. Wise's multiple complicated and serious medical conditions."  (*Id.* ¶¶ 82–83.)  This would be in stark contrast to the consistent and reliable access to treatment that Bob currently has from his established team of doctors.

In addition, the prison environment and its susceptibility to infectious disease is itself an independent medical threat to Bob.  (*Id.* ¶¶ 65–70.)  This concern predates COVID but has certainly been exacerbated by it.  (*Id.*)  Based on Mr. Terris's lengthy experience working within the BOP, "it is simply misguided to believe that infectious diseases, which can be deadly for Mr. Wise, can be effectively controlled in a carceral setting[.]"  (*Id.* ¶ 70.) ███████████████ ████████████████████████████████████████████████████████████████ ███████████████████████████████████  A new strain of COVID or MRSA infection could well be fatal to Bob.

Finally, because of Bob's medical needs, he would likely be ineligible for certain forms of sentencing relief that would otherwise be available to BOP inmates.  For example, he most likely would not be approved for transition to a Residential Reentry Center, colloquially known as a halfway house, because they "are not equipped to handle complex medical situations."  (*Id.* ¶ 72.)  In addition, he likely would not be able to participate in programs under the First Step Act, through which he could otherwise earn credit toward prerelease custody, because his many

medical appointments will conflict with programming.  (*Id.* ¶ 73.)  Thus, Bob would likely face a

longer time in prison than a healthy inmate in his position, solely due to his medical needs.

Bob's daily challenges would also pose intense logistical difficulties to manage in a

prison setting. 

Finally, Bob also requires

. Yet there is no guarantee he

will receive the necessary medication and medical devices.  Indeed, a 70-year-old defendant was

recently granted compassionate release after he was deprived of his medication and his CPAP

machine, and was "particularly vulnerable to COVID, notwithstanding his vaccination and prior

infection."  (*See United States v. Moe*, No. 17 Cr. 277, Dkt. 125 at 11–12 (D.N.J. Nov. 12, 2021)

(KSH) ("For at least several weeks after he reported to FCI Fort Dix, [Moe] was not given access

to multiple medications and his CPAP machine, and if he is required to return to quarantine [due

to COVID], he will again be deprived of his CPAP machine," since "BOP guidance does not

permit inmates to utilize CPAP machines while in quarantine").)

While the loss of liberty is devastating to any defendant, it is plain from the

circumstances that the collateral consequences of incarceration to Bob's health are extreme and

unduly harsh, such that a variance is appropriate.  The case of Mr. Joseph Hoats is instructive.

Like Bob, Mr. Hoats was an attorney who, at age 72, had medical issues.  He faced a Guidelines

range of 15–21 months for one charge of perjury, but was sentenced principally to time served followed by two years of supervised release, with six months of that time under home confinement. *United States v. Joseph Hoats*, No. 19 Cr. 67, Dkt. 134 (S.D.N.Y. May 20, 2021) (PGG). As in this case, Probation had recommended time served, where Mr. Hoats suffered from declining physical health and had "a network of highly skilled medical providers, including a cardiologist, who [were] vigorously addressing all of his medical concerns" and providing "the type of care that the BOP is not equipped to provide." *Id.* at 7. Mr. Hoats had already suffered punishment, "in that he [could] no longer practice law and his livelihood [was] significantly diminished." *Hoats*, Dkt. 128 at 3 (S.D.N.Y. Apr. 8, 2021) (quoting *Hoats* PSR at 24). For these reasons, Probation recommended and the court imposed a non-incarceratory sentence. *Id.*

Like Mr. Hoats, Bob's medical circumstances warrant the recommended non-incarceratory sentence, particularly when coupled with the other relevant considerations under Section 3553(a).

> **2.      Bob's Wife Depends upon Bob as a Result of Her Significant Health Issues and Limited Mobility.**

The recommended sentence of time served is also appropriate so that Bob can continue to support and care for his wife Kathleen, who is very much in need of his assistance. Despite his own medical problems and frailty, Bob has been and continues to manage his and Kathleen's household. They do not have another family member who can do this if Bob is incarcerated, and his absence will "wreak extraordinary destruction" on Kathleen. *See United States v. Johnson*, 964 F.2d 124, 128–29 (2d Cir. 1992) (recognizing that "[t]he rationale for a downward departure here is not that [defendant's] family circumstances decrease her culpability" but finding that extraordinary circumstances, as distinct from "ordinary family responsibilities," may independently justify departure "on behalf of [defendant's] family").

In situations such as this, where a defendant has a dependent who relies upon him for support, and other family members cannot assume the defendant's role, courts have recognized that a non-custodial sentence is appropriate.  In *United States v. Stewart*, a case involving insider trading that spanned over four years, the court varied downward from the Guidelines range of 30 to 37 months and imposed a principal sentence of four years' probation with 12 months of home detention.  No. 15 Cr. 287, Dkt. 95 at 21, 26–28, 32 (S.D.N.Y. May 18, 2016) (LTS).  In imposing this sentence, Judge Swain recognized that the defendant was "the primary caregiver over the last several years for his wife, who suffers from a number of serious health conditions," and "other family members are not available to provide regular or even urgent assistance" to her. *Id.* at 29.

Similarly, in *United States v. Roberts*, No. 01 Cr. 410, 2005 WL 1153757 (S.D.N.Y. May 16, 2005) (RSW), the defendant faced a Guidelines range of 10–16 months' imprisonment, yet the court gave considerable weight to his extraordinary family circumstances and imposed a non-incarceratory sentence of time served with 10 months of home confinement.  *Id.* at *4–7.  The defendant was the sole caretaker for his chronically ill and disabled life partner who "experience[d] difficulty with everyday living, including keeping track of medications, cooking and cleaning." *Id.* at *5.

Bob's and Kathleen's circumstances are similarly compelling.  Kathleen has come to depend upon Bob for virtually everything.  As noted earlier, ███████████████████ ██████████████████████████████████████████████████████ ████████████████████████████████  (Exh. C-2 at 6.)  Bob almost always accompanies her when she does leave their home, including driving her to doctors' appointments.

He also does their grocery shopping and cooks their meals, maintains their home, and handles all their finances, bills, and insurance.  (Exh. C-1 at 2.)

Most significantly, as it relates to her medical situation, ████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ███████████████████████████████████████████ Kathleen does not have the capacity to carry on independently without Bob, or to maintain their house of 43 years.

There is no other family member who can assume Bob's role if he is incarcerated.  It is not realistic for Alyssa or Greg—who live and work in Nashville and Atlanta, respectively—to assume Bob's responsibilities as it relates to Kathleen and their home if Bob is incarcerated. (Exh. C-14 at 2 ("Neither of their two children are able to provide the level of help that Bob and Kathleen provide to each other.").)  In other words, Bob and Kathleen are like two trees that have grown into one.  They lean on each other for support—literally and figuratively—and cannot stand alone.  Separation of the two could yield disastrous outcomes.

We respectfully submit that in this case, as in *Stewart* and *Roberts*, Bob's family circumstances warrant the recommended sentence of time served.  Of course, we recognize that a sentence always affects a defendant's family members.  But that does not change the fact that a sentence would have an unusually harsh impact on an innocent member of Bob's family in this case.  *See Gall v. United States*, 552 U.S. 38, 47, 52 (2007) (recognizing that the sentencing judge must "consider every convicted person as an individual and every case as a unique study" and that "extraordinary" circumstances are not required to justify a non-Guidelines sentence (punctuation and internal citation omitted)).

**B.      The Nature and Circumstances of Bob's Offense Support a Non-Custodial Sentence.**

What also sets Bob apart from the vast majority of criminal defendants is that the very same actions that came to constitute the *actus reus* of his crime had previously been perfectly legal for over 10 years, and Bob did not set out to break the law or initially appreciate that he had.  Facially innocuous payments that Bob had made on behalf of a client to tax authorities and service providers became illegal overnight when OFAC, a federal agency with which Bob did not have any particular familiarity, designated Vekselberg—an individual Bob never represented, met, or otherwise interacted with—as an SDN.

Over time, Bob came to suspect that something was amiss, and the question marks began to arise.  At some point, Bob made a conscious decision not to press the issue.  It is in this context—an admittedly grave error in judgment for which Bob has accepted full responsibility, in an otherwise law-abiding and productive life—that the Court should consider Bob's conduct.

**C.      A Sentence of Time Served Provides Sufficient Deterrence, Protects the Public, and Serves Just Punishment.**

The Court must fashion a sentence that "afford[s] adequate deterrence to criminal conduct," "protect[s] the public from further crimes of the defendant," and is "just punishment for the offense."  18 U.S.C. § 3553 (a)(2)(A)–(C).  A sentence of time served satisfies those purposes, as Bob has been and is being punished, deterrence has been served, and there is no need to incarcerate Bob to protect the public.

Bob has suffered immensely as a result of his criminal conduct.  He is ashamed, humiliated, and devastated that he has let down himself and his family.  He held himself to the highest standards, to which he adhered throughout his life, and now, in his final chapter, he is a convicted felon.  Bob built a career about which he was passionate, and he had a sterling reputation, and he has lost both.  Shortly after his plea, Bob proactively resigned as an attorney

from the New York State Bar, so he is no longer licensed to practice law, and his reputation is permanently marred. Bob loved being an attorney—it was a core part of his identity—and he has struggled emotionally with this loss. (Exh. C-2 at 6 ("[T]he stability and security he worked his whole live life to achieve have been taken away, and his core identity as a provider for his family and lawyer who took his profession seriously have been struck down.").)

Bob has also punished himself emotionally. (Exh. C-1 at 2 ("Bob has been so distressed over this legal matter. He feels so guilty and has so much worry and anxiety."); "Exh. C-11 at 2 ("I believe the case affects Bob severely every day and has brought him tremendous embarrassment and frustration. He is terribly remorseful.").) He has been grappling with stress and fear over what is to come—in particular, the fear of being unable to care for his wife and how she would manage in his absence. (Exh. C-2 at 6 ("[B]eing separated from and unable to care for my mother when she needs him most would be a brutal blow that I don't think he would ever recover from.").) He and his family are convinced that if incarcerated, he will die in prison, without his loved ones in his final days, and given his medical problems and needs, this is a realistic fear—all the more realistic given his recent deterioration in health. (Exh. C-1 at 2; Exh. C-2 at 6; Exh. C-3 at 2.) In addition to all of his medical ailments listed above, and his recent need for emergency medical care, Bob is a shell of who he once was. ████████████████

██████████████████████████████████████████

█████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████

██████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████

███████████████████

Bob does not pose any risk of committing another offense.  This offense was an aberration in a life that Bob has otherwise lived honestly and honorably.  Probation agrees.  (PSR at 38 (noting that Bob, at 83, has "otherwise been a law-abiding and contributing member of society, thereby evincing that his participation in this crime truly represents aberrant behavior").)  He accepted responsibility and acknowledged his wrongful conduct.  Given this, and that he has suffered immensely, Bob is already deterred—and incapacitated both due to age and the inability to continue practicing law—from committing a repeat offense, and incarceration would not further any purpose of sentencing.  *See, e.g.*, *Jacoby*, Dkt. 19 at 11–13 (imposing sentence of time served followed by two years of supervised release on defendant in his mid-sixties, where sentencing judge was "very influenced here by [defendant's] health" and aberrational nature of the offense "compared to the entirety of [defendant's] career," and "[t]here is no reason here, in terms of individual deterrence, to send [defendant] to prison" where defendant's "working days are over" and "this is the only criminal activity for which [defendant] will have been convicted in a long working career.").

General deterrence has also been served and will not be furthered by a period of incarceration.  Bob's conduct, conviction, and disbarment have been well publicized, including

by the Wall Street Journal, Reuters, Bloomberg, and the New York Law Journal.[13]  Consequently,

his situation has already provided a cautionary tale to other attorneys about the consequences of

breaking the law.  Indeed, the fact that Bob's conviction stems from conscious avoidance

provides even greater deterrent effect to his plea—this sends a message to attorneys that they

must not turn a blind eye to red flags or decline to press for answers about those red flags.  For

anyone similarly situated to Bob, the purpose of deterrence has been served by everything Bob

has lost—his unblemished reputation from over 50 years of law practice; his livelihood and

source of income (along with a significant portion of his life savings due to legal proceedings[14]);

and the further deterioration of his health.  He is also forfeiting all of the money he was paid in

connection with the offense.[15]

Finally, there is no benefit to the public by incarcerating Bob.  To the contrary,

incarceration would be costly to the public and pose great challenges to the already-strained

BOP, which could otherwise devote an FMC bed and its limited medical resources to inmates

who may never be eligible for release and have long been waiting for such care.  (Exh. F ¶¶ 45–

46 (noting inmates and accompanying correctional staff are waiting in community hospitals for

---

[13] Dylan Tokar, *American Lawyer Pleads Guilty Over Work for Sanctioned Russian Oligarch*, WALL ST. J. (Apr. 25, 2023), https://www.wsj.com/articles/american-lawyer-pleads-guilty-over-work-for-sanctioned-russian-oligarch-bda8c37a; Luc Cohen, *US Lawyer Pleads Guilty to Dealing with Russian Oligarch Under* Sanctions, REUTERS (Apr. 25, 2023), https://www.reuters.com/world/us/us-lawyer-pleads-guilty-dealing-with-russian-oligarch-under-sanctions-2023-04-25/; Chris Dolmetsch, *Lawyer Laundered Russian Oligarch's Money by Paying Bills for His NY Homes*, BLOOMBERG (Apr. 25, 2023), https://www.bloomberg.com/news/articles/2023-04-25/lawyer-laundered-oligarch-money-by-paying-bills-for-his-ny-homes; Emily Saul, *Robert Wise Disbarred for Aiding Sanctioned Russian Oligarch*, N.Y.L.J. (Sept. 14, 2023), https://www.law.com/newyorklawjournal/2023/09/14/robert-wise-disbarred-for-aiding-sanctioned-russian-oligarch/.

[14] As may be already apparent, Bob is very frugal and has managed his finances very carefully for a lifetime of working and saving of over 50 years.  He has been able to save substantial sums and has paid extensive legal fees and disbursements from his personal funds.  It is now very difficult for Bob to spend a substantial portion of his savings, which he intended to use for him and Kathleen to sustain them for the remainder of their lives.

[15] Bob, through counsel and with the assistance of the Government, has been diligently working for many months to get OFAC to authorize the release of certain frozen funds to pay his forfeiture judgment.

beds at FMCs to become available so they can be transferred).)  "[S]entencing Mr. Wise to a

non-custodial alternative, because he is a non-violent, first-time offender and seriously ill,

provides this Court an opportunity to make available for an existing male inmate in dire medical

need, who has no other option to incarceration, a much-needed bed at an FMC." (*Id.* ¶ 49.)  This

would also alleviate "the heavy financial burden that would be placed upon the BOP to provide

frequent and necessary medical treatment for Mr. Wise's significant and complicated medical

care needs." (*Id.*)

Furthermore, as previously described, BOP staffing is a finite resource, and any staff

assigned to accompany Bob to a medical appointment could be better allocated to an inmate who

also needs medical attention but is not suitable for a non-incarceratory setting.  Coupled with the

virtual certainty that Bob will not commit any further crimes, it is plain that society would be

better served by allowing Bob to serve a non-custodial sentence.

Finally, a fine is neither needed nor warranted to further the purposes of punishment and

deterrence.  While the Guidelines authorize a fine of $15,000 to $150,000, Probation, having

considered the factors set forth in 18 U.S.C. § 3572, "do[es] not believe that the imposition of an

additional fine is necessary." (PSR at 41.)  Section 3572 requires courts to consider factors such

as "the need to deprive the defendant of illegally obtained gains from the offense," and here, Bob

has already agreed to disgorge "the ill-gotten gains derived from the offense." (PSR at 41.)

### D.   The Need to Avoid Unwarranted Sentencing Disparities Supports Time Served.

Finally, a sentence of time served furthers "the need to avoid unwarranted sentence

disparities among defendants with similar records who have been found guilty of similar

conduct." 18 U.S.C. § 3553(a)(6).

44

The only other person charged with this offense is Voronchenko, whose indictment was unsealed on February 7, 2023.  (Dkt. 1 ("Voronchenko Indictment").)  The Voronchenko Indictment came as a surprise to Bob, as did Voronchenko's apparent flight from the United States.  (*Id.* ¶¶ 31–33.)  Given that Voronchenko appears to be a fugitive, he is unlikely ever to find himself in a United States courtroom to face the consequences of his actions, let alone be imprisoned as a result.

Vekselberg, whose status as an SDN is the factual foundation of Bob's criminal conduct, has not been charged criminally in the United States and does not reside here.  There is no reason to think that he would face imprisonment as a punishment for the money laundering and/or sanctions evasion scheme, despite being its ultimate beneficiary.

As a result, if incarcerated, Bob, despite being the least culpable participant, would likely be the only person involved in this criminal conduct to face that penalty.

Bob also stands in contrast to similarly situated individuals charged or referenced in other Task Force KleptoCapture cases.  Within the Vekselberg orbit, the only other indicted attorney appears to have been a far more active participant in the scheme.  According to the allegations contained in the indictment against him, Vladislav Osipov was the attorney of record for the "Tango," Vekselberg's luxury yacht. *United States v. Osipov*, No. 22 Cr. 369, Dkt. 1 ¶ 26 (D.D.C. Nov. 15, 2022).  As alleged, he held multiple senior positions in Veskelberg-owned entities; he knew that Vekselberg was the ultimate beneficial owner of the Tango and that it was used solely for him; he actively participated in a sanctions evasion scheme, including receiving an organization chart of Vekselberg shell entities; he deliberately used shell companies to obfuscate Vekselberg's ownership of the Tango; he organized payments in U.S. dollars that he knew would be funded in Euros; he participated in strategy discussions about how to avoid

documentation of Vekselberg's beneficial ownership; and he affirmatively made a false representation that Vekselberg was merely a user, not an owner, of the Tango. *Id.* ¶¶ 35–36. Osipov, in other words, was allegedly not only "in on" the scheme, but had a hand in designing it. Osipov is a Swiss citizen located in Switzerland.

By contrast, Bob never interacted with Vekselberg, Bob represented properties he never knew to be used by Vekselberg, Bob lacked insight into the structure of shell companies leading to Vekselberg, Bob did not make false representations about beneficial ownership, and he did not discuss sanctions evasion strategy.

Another attorney who apparently played a role in a sanctions evasion scheme also appears (based on publicly available information) to have engaged in conduct far more culpable than Bob and yet has not been indicted. The unnamed "Malofeyev Attorney" referenced in *United States v. Malofeyev*, No. 21 Cr. 676, Dkt. 6 (S.D.N.Y. Apr. 5, 2022), is alleged to have directly represented Malofeyev, an SDN, and falsely stated to a U.S. bank, "As far as I know, the ownership over [the Shell Company] was transferred by Mr. Malofe[y]ev to a third party (a new ultimate beneficial owner) at the beginning of July 2014, i.e. before the SDN designation." *Id.* ¶ 33. However, the Malofeyev Attorney allegedly knew that the referenced transfer occurred in June 2015, after the designation of Malofeyev as an SDN. *Id.*

Again, here, there is no allegation that Bob represented Vekselberg or had any communications with him, or lied about the timing of a transaction for the purpose of evading sanctions. Yet Bob faces possible incarceration while the Malofeyev Attorney, who knowingly and willfully evaded sanctions, does not.

Bob's role is much more analogous to that of the unindicted "Nominee" who is referenced in *United States v. Derkach*, No. 22 Cr. 432, Dkt. 9 (E.D.N.Y. Jan. 23, 2023). As

contained in publicly available information, the Nominee was a financial services professional, who was used by Derkach, an SDN, to purchase two condos in Beverly Hills while concealing his ownership interest.  *Id.* ¶ 14.  The Nominee, who allegedly received misrepresentations from Derkach, set up and managed corporate entities to own the condos and unknowingly made false representations about the ownership of funds to U.S. financial institutions.  *Id.* ¶¶ 18–19.  When one bank refused to open an account for Derkach's partner because of negative press about Derkach, the Nominee inquired about this, and Derkach advised that the bank must have him confused with another person of the same name.  *Id.* ¶ 22.  The Nominee received approximately $3.92 million in wire transfers into a "Client Specific Trust Account" from overseas shell companies on behalf of Derkach and his partner.  *Id.* ¶¶ 23–24.  The Nominee transferred approximately $3.115 million of those funds to a title insurance company to purchase the condos, and he was also paid for services he provided to Derkach, including initiating payments for "homeowners' association dues, utilities, taxes and other fees" on behalf of the Beverly Hills condos.  *Id.* ¶¶ 24, 30.

This narrative is extremely similar to the situation with Bob, though Bob notably was a degree further removed, because his client was not the SDN himself, but another individual.

In all three of these other cases, the individuals at issue communicated directly with an SDN, and the two attorneys are alleged to have had direct knowledge of facts in furtherance of a sanctions evasion scheme.  Bob's conduct, in contrast, is far less culpable.

**CONCLUSION**

For the foregoing reasons, we respectfully request that the Court impose the sentence recommended by Probation and the Government: time served followed by one year of supervised release and no fine.[16]

Dated: New York, NY
       November 20, 2023

Respectfully submitted,

/s/Jillian B. Berman
Jillian B. Berman
Angela Zhu
LANKLER SIFFERT & WOHL LLP
1185 Avenue of the Americas
New York, NY  10036
Telephone: (212) 921-8399
Fax: (212) 764-3701
jberman@lswlaw.com
azhu@lswlaw.com

*Attorneys for Defendant Robert Wise*

---

[16] Additionally, we will ask the Court for the following accommodations:

First, consistent with Probation's recommendation (*see* PSR at 39), we respectfully request that the mandatory drug testing condition be suspended, as there is no reason to believe there is a risk of substance abuse ████████ ████████████████████.

Second, we respectfully request that Bob be excused from standard condition seven, which requires him to work full-time unless excused.  (PSR at 40.)  Bob has only ever worked as an attorney, which he no longer can, and he is well over retirement age.

Third, we respectfully request that Bob be supervised from the White Plains office, as traveling into Manhattan is difficult for him.