

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

November 27, 2023

**BY ECF and EMAIL**

The Honorable Mary Kay Vyskocil
United States District Judge
Southern District of New York
500 Pearl St.
New York, New York 10007

      Re:    *United States v. Robert Wise*, 23 Cr. 73 (MKV)

Dear Judge Crotty:

      The Government respectfully submits this letter in connection with the sentencing of defendant Robert Wise (the "defendant"), scheduled for Monday, December 4, 2023 at 11:00 a.m. Over the course of several years, the defendant participated in laundering nearly $4 million that were used to violate the United States' sanctions regime. The parties have stipulated to a Guidelines sentence range of 37 to 46 months' imprisonment (the "Stipulated Guidelines Range"), and Probation has recommended a sentence of time served. The Government agrees that, given the defendant's role in the conduct and the significant collateral costs of a custodial sentence, a sentence of time served would accomplish the objectives of 18 U.S.C. § 3553(a).

## Offense Conduct

      On April 6, 2018, the U.S. Department of the Treasury's Office of Foreign Assets Control ("OFAC") designated Viktor Vekselberg as a Specially Designated National ("SDN") in connection with its finding that the actions of the Government of the Russian Federation in Ukraine constituted an unusual and extraordinary threat to the national security and foreign policy of the United States. On or about March 11, 2022, OFAC redesignated Vekselberg as an SDN and blocked Vekselberg's yacht and private airplane. (Final Presentence Investigation Report, dated July 18, 2023 ("PSR") ¶¶ 12-19).

      Prior to his designation by OFAC, between approximately 2008 and 2017, Vekselberg, through a series of shell companies, acquired six real properties in the United States, specifically, (i) two apartments on Park Avenue in New York, New York, (ii) an estate in Southampton, New York, (iii) two apartments on Fisher Island, Florida, and (iv) a penthouse apartment also on Fisher Island, Florida (collectively, "the Properties"). (PSR ¶¶ 21-23).

      Vladimir Voronchenko, Vekselberg's longtime associate, retained the defendant, an attorney who practiced in New York, New York, to assist in the acquisition of the Properties. The defendant also managed the finances of the Properties, including by paying common charges,

property taxes, insurance premiums, and other fees associated with the Properties in U.S. dollar transactions from the defendant's interest on lawyer's trust account ("IOLTA account"). (PSR ¶¶ 24-30).

In particular, prior to Vekselberg's designation as an SDN, between approximately February 2009 and March 2018, shell companies owned by Vekselberg sent approximately 90 wire transfers totaling approximately $18.5 million to the IOLTA account. At the direction of Voronchenko and his family member who lived in Russia, the defendant used these funds to make various U.S. dollar payments to maintain and service the Properties. (PSR ¶ 31).

Immediately after Vekselberg's designation as an SDN, the source of the funds used to maintain and service the Properties changed. The IOLTA Account began to receive wires from a bank account in the Bahamas held in the name of a shell company controlled by Voronchenko, Smile Holding Ltd., and from a Russian bank account held in the name of a Russian national who was related to Voronchenko. Between approximately June 2018 and March 2022, approximately 25 wire transfers totaling approximately $3.8 million were sent to the defendant's IOLTA account. Although the source of the payments changed, the management of the payments remained the same as before: the defendant used these funds to make various U.S. dollar payments to maintain and service the Properties, and he did so consciously avoiding the fact that he was promoting sanctions violations. Additionally, after Vekselberg was sanctioned in 2018, Voronchenko, the defendant, and others tried to sell both the Park Avenue apartment and the Southampton estate. No licenses from OFAC were applied for or issued for these payments or attempted transfers. (PSR ¶¶ 32-35).

## Procedural History

The defendant self-surrendered to law enforcement authorities on April 25, 2023 and pled guilty pursuant to a plea agreement that same day to a one-count Information charging him with conspiracy to commit international money laundering, in violation of 18 U.S.C. § 371. In the plea agreement, the parties stipulated that the amount laundered was between $3,500,000 and $9,500,000, that the defendant was a minor participant in the criminal activity, and that defendant violated a position of private trust or special skill in committing the crime. The parties further stipulated to a Guidelines range of 46 to 57 months' imprisonment, based on a total offense level of 23 and a Criminal History Category of I.

On November 8, 2023, the parties executed a rider to the plea agreement incorporating a further two-level reduction, pursuant to U.S.S.G. § 4C1.1, as reflected in the November 1, 2023 version of the Guidelines Manual. The parties stipulated to a Stipulated Guidelines Range of 37 to 46 months' imprisonment, based on a total offense level of 21 and a Criminal History Category of I.

The Probation Office's Guidelines calculations are consistent with those set forth in the plea agreement and do not reflect the changes made in the November 1, 2023 Guidelines Manual. The Probation Office recommends a below-Guidelines sentence of time served based on the defendant's "advanced age, extensive physical health issues, lack of criminal history and minor participation in the offense." (PSR at 38). The defendant also seeks a sentence of time served, noting, among other things, his and his wife's health issues, the collateral consequences of his guilty plea, and the need to avoid unwarranted sentencing disparities. (Def. Memo at 31-47).

**Discussion**

**I.     Applicable Law**

As the Court is well aware, the Guidelines are no longer mandatory, but they still provide important guidance to the Court following *United States v. Booker*, 543 U.S. 220 (2005), and *United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005). "[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range," which "should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007). The Guidelines range is thus "the lodestar" that "'anchor[s]'" the district court's discretion. *Molina-Martinez v. United States*, 136 S. Ct. 1338, 1345-46 (2016) (quoting *Peugh v. United States*, 133 S. Ct. 2072, 2087 (2013)).

After making the initial Guidelines calculation, a sentencing judge must consider the factors outlined in Title 18, United States Code, Section 3553(a), and "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing outlined in 18 U.S.C. § 3553(a)(2). To the extent a district court imposes a sentence outside the range recommended by the Guidelines, it must "'consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance.'" *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (*en banc*) (quoting *Gall*, 552 U.S. at 50).

**II.    A Non-Incarceratory Sentence Would Be Appropriate in This Case**

The Government respectfully submits that a non-incarcertaory sentence would reflect the nature and circumstances of the offense, promote respect for the law, and provide for adequate general and specific deterrence.

As an initial matter, the defendant engaged in serious criminal misconduct. In announcing the April 6, 2018 sanctions against Vekselberg and others, then-Secretary of the Treasury Steven T. Mnuchin stated the following:

> The Russian government operates for the disproportionate benefit of oligarchs and government elites. The Russian government engages in a range of malign activity around the globe, including continuing to occupy Crimea and instigate violence in eastern Ukraine, supplying the Assad regime with material and weaponry as they bomb their own civilians, attempting to subvert Western democracies, and malicious cyber activities. Russian oligarchs and elites who profit from this corrupt system will no longer be insulated from the consequences of their government's destabilizing activities.[1]

---

[1] "Treasury Designates Russian Oligarchs, Officials, and Entities in Response to Worldwide Malign Activity," April 6, 2018, *available at* https://home.treasury.gov/news/press-releases/sm0338.

3

Since 2018, the Russian government has taken its malign activities to new levels, including its ongoing war against Ukraine. Meanwhile, a select few in Russia have profited enormously while the Russian state has sown instability abroad and stolen from its own citizens. Sanctions are a key tool at the United States' disposal to punish those complicit in Russia's violent and destabilizing activity by targeting their overseas assets. By helping to maintain tens of millions of dollars of luxury real estate in the United States for Viktor Vekselberg, the defendant undermined the sanctions regime for no other reason than personal profit.

Moreover, there is nothing unusual or mitigating about the fact that the defendant's conduct was legal prior to the imposition of sanctions. Many criminal statutes—and practically all white-collar crimes—involve facially permissible activity that only becomes illegal with the requisite mental state. Indeed, there could hardly be clearer notice that these transactions were unlawful following the imposition of sanctions. The defendant, an attorney with over half a century of experience, was in the best possible position to understand the implications of Vekselberg's designation once he became aware of them. Nevertheless, the defendant conspired with others to continue transferring money into the United States to promote the violation of OFAC sanctions.

However, there are considerable mitigating factors that counsel against an incarceratory sentence in this case. First, a prison term would be particularly punitive given the defendant's personal circumstances. At 83 years old, the defendant suffers from numerous medical conditions that would be more expensive and more difficult to treat in a prison setting. Additionally, the defendant is the primary caregiver for his wife, who also suffers from serious health issues. Thus, a prison term would disrupt the care of two elderly individuals.

The defendant's minor role in the offense also counsels against an incarceratory sentence. This is the defendant's first criminal conviction and he clearly neither sought out nor directed the unlawful conduct. Nevertheless, the defendant has admitted his involvement in the conspiracy and faces significant collateral consequences that impact the appropriate sentence. He has resigned his membership from the bar and agreed to pay over two hundred thousand dollars in forfeiture. All of this serves as an important warning to other facilitators—even those with limited involvement in sanctions evasion—that there are serious consequences for subverting the sanctions regime.

**Conclusion**

  For the foregoing reasons, the Government respectfully requests that the Court impose a non-incarcertory sentence on the defendant.

          Respectfully submitted,

          DAMIAN WILLIAMS
          United States Attorney

      By:_____/s/_____
          Jessica Greenwood / Sheb Swett
          Assistant United States Attorneys
          (212) 637-1090 / 6522

Cc:  Defense counsel (by ECF and email)